Thank you and good morning, your honors. Katie Hrolbrink on behalf of Mr. Fencl. This court must reverse Mr. Fencl's failure to register convictions on two grounds. First, the good faith exception does not apply, both because of the police department's systemically negligent approach to AB 1950 in misdemeanor cases, and because of these individual officers' reliance on systemically erroneous data sources and unreasonable legal advice. Second, prosecutors precipitated constitutional error by indicating to the jury that only knowledge, not intent, was required to convict. I'll begin with good faith. So as noted, there are two independent reasons for precluding good faith in this case, the first of which involves the police department's systemic negligence, which really set White up to fail. This police department did not correct any source of data that its officers could have relied upon to determine the proper probation sentence. There was no effort to correct police databases in misdemeanor cases and no effort to correct court minutes. And under Haring, if police had been shown to be reckless in maintaining a data system, there it was a warrant system, exclusion would certainly be justified. The department also did not at all train their officers how to apply this very simple law, a law that reduced all misdemeanor sentences to one year unless the statute of conviction provided otherwise. But they sent a memo saying call the probation office. They did, Your Honor. But just relying on probation officers' ad hoc legal opinions was not a responsible approach to this pervasive law as the government's own witness testified. The supervisory probation officer said if court orders are not written down and updated, then it's up to the probation officers to calculate the term, which could be incorrect. And so according to their own witness, doing it that way would be possible but not advisable. And we saw the results of that in this case where this probation officer gave an ad hoc legal opinion that Mr. Fentzel's sentence, you know, had not been reduced by this law when it clearly had. And so that was, and as we know from Song case, that bad legal advice does not support good faith because mistakes of law can never support good faith. And under Hine, a third party's objectively unreasonable legal advice only goes to the officer's subjective understanding of the law, not to the objective reasonableness of that bottom line conclusion as a legal matter. Does it matter that the police officers seemed to be pretty thorough in checking several different places before he served the warrant? Does that make any difference? The fact that he was, he checked, he was pretty thorough it looked like to me. The cop himself. Yes, your honor. So the good faith exception does not apply just because an officer is trying their best. It does not apply just because an officer is acting with subjective goodwill. It is a very particular test that asks whether a reasonably well-trained officer would rely on the sources that this officer did. So let's walk through the sources. First, this officer relied on his police database. The record reflects that that police database was riddled with systemic errors, wrong in not just sometimes, but most of the time for pre-AB1950 cases. And no one was making any effort to correct that database. So really for him, there are two options. Either he knew that this database was riddled with error and unreliable, in which case it was objectively unreasonable for him to rely on it, or he didn't know, in which case he wasn't reasonably well-trained. Because any reasonable police department would inform their officers that their data sources were that pervasively unreliable. You can do the exact same analysis with the second step that he took, which was to call a city attorney. But contrary to the implication in the government's brief, this was not a legal consultation. The Detective Howard and this city attorney employee did not talk about AB1950. Howard did not ask whether Mr. Finsel was on probation. There's no evidence that the city attorney even knew anything about AB1950. The only thing that happened was he asked for Howard to review the court minutes and Howard, or sorry, for the city attorney to review the court minutes, and the city attorney told him that in the court minutes, Mr. Finsel was ordered to be on probation for a length of time that included the time during the search. So he really just conveyed the raw information from the court minutes. But the court minutes have the same problem. They were, you know, created before AB1950's retroactive reductions. They were therefore wrong not just sometimes, but most of the time. And the record reflects that no one was making any effort to correct them. So a reasonably well-trained officer would not have relied on them. And then you get back around to the probation officer's legal advice, which as already noted, categorically doesn't apply for good faith, doesn't qualify for good faith under Songda Cha and Hine, because the stakes of law can never support good faith, and Hine says that that includes when an outside source provides legal advice that as a legal So I do think that the police department's systemic negligence in this case really left him with very few good options, because they didn't correct their data sources, so he couldn't use that. They didn't teach him the law, so he couldn't do that. And they just had him eliciting these ad hoc legal opinions from probation officers that didn't even supervise misdemeanors. So I agree that put White in a bind, but that doesn't allow the government what he chose to do that would more comport with his obligations. Yeah, so Your Honor, so I just want to make the point that to the extent that the police department's systemic negligence left him without good, reasonable avenues to pursue, that systemic negligence is itself under Haring a reason to preclude good faith. But if the police department had been responsible and had updated her records, he could absolutely benefit from good faith doing the kinds of things that he did in this case. So if these records were updated and you look at your police database, it should be right. And if it turns out to be wrong, you benefit from good faith. If these court minutes were updated and you call somebody and ask about the court minutes... How does he know they're not? I mean, I just can't really attribute bad faith to him. Well, Your Honor, Haring is very clear. We are not asking whether he acted in subjective bad faith. It is a more particular analysis where we're asking whether a reasonably well-trained officer acted in objectively reasonable reliance on these sources. And if he didn't know that these sources he was relying on were riddled with systemic error, wrong most of the time, and that no one was correcting them, then he wasn't well-trained. Because no reasonable police department would just fail to inform their officers that the data sources they were relying on were utterly unreliable. And any other conclusion would basically encourage police departments or excuse police departments when they do not take reasonable steps to equip their officers to make the right call in a situation as critical as this one, which is a warrantless search of a U.S. citizen's house. Counsel, how long... What was the span of time? I just don't know. I'm trying to figure out... You say reasonable, and I understand that, but what is reasonable in terms of how fast should these changes have been made to the system showing the AB 1950 and the fact that misdemeanor people in certain crimes now only had a one-year probationary term? Yeah. So I really want to be clear about this, Your Honor, because I think the government's brief mischaracterizes it. In misdemeanor cases, no one was making any effort to update the records at all. It was not a matter of time lag. It wasn't like they were getting to it, but they hadn't gotten to it. No one was making any effort to correct these systems. And we know that because the probation officer testified that he was only... His office was only making these updates in felony cases. Misdemeanors were handled separately. He wasn't involved, and he didn't have knowledge of any effort to make these updates in misdemeanor cases. But that said, this search did take place six months after the law's effective date, and when it came to felonies, those records were being updated... I believe the testimony was beginning six months before the effective date. So they knew ahead of time this was coming down the pipe, and they were already making corrections before the effective date came up. Whose testimony is that? It is the supervisory probation officer. So I would point, Your Honors, to ER 194 to 195, ER 200, ER 202 to 204. Really throughout the testimony, this probation officer was very clear his office did not handle misdemeanors and did not handle any misdemeanor corrections. So I'm happy to answer additional questions out of good faith. Otherwise, I can briefly touch on my second issue. So the prosecutor also precipitated constitutional error by telling the jury that only knowledge, not intent, was required to convict, even though Mr. Finsel's entire defense was based on intent. But the legal theory there was not true, either for short-barreled rifles or for silencers. We know that it's not true for short-barreled rifles because the definition uses the word intended, and this Court has already interpreted the same statute to target subjective intent. Also, interpreting it objectively would create a surplusage problem inasmuch as there's no situation in which you could objectively design and make something to shoot from the shoulder but not objectively intend for it to be done. Whose intent are we looking at? Because the way it's worded is intended to be, right? So, like, when it's manufactured. So we're looking at the user's intent, and I think we can see that from three... Why are we looking at user's intent? There are three reasons. So first, when this Court interpreted the word intended in Fredman, this Court, in the destructive device definition, this Court interpreted it to target subjective user intent. So the canon, that the same word used in the same statute usually means the same thing, would militate in favor of that reading. Second, saying that it was manufacturer intent would create a surplusage problem because it's very hard to imagine a situation where a manufacturer objectively designed and objectively made a gun to be shot from the shoulder but didn't subjectively intend for it to be done in that way. And finally, it would actually limit defendant's liability in a way that makes not very much sense because, for example, if a manufacturer designed an item to be a pistol and made it into a pistol and intended for it to be a pistol, then it would be a pistol no matter what the end user did with it. So even if the end user sticks a shoulder stock on there and starts shooting, it would not be intended to be a rifle because the only thing we care about is manufacturer intent, according to the government. And that doesn't make a lot of sense. Unless Your Honors have additional questions, I'll reserve the remainder. I do. I do. I want to understand, when you're talking about intent for the short barrel rifle in particular, I guess I'm confused. It still had the stock, correct? Correct, Your Honor. So that's why intent was so central to Mr. Finsel's defense. His testimony was, I put the stock on the gun just to stabilize it in the safe so that it stood up side by side with the other firearms. So when I actually shot the firearm, I would take the stock off and use it as a pistol. So even though it was configured as a rifle while in the safe, intent made all the difference. And we just have to take his word for it? Or was there evidence that demonstrated that it couldn't be shot with the stock still on it? There was evidence that all of these charged firearms were still in process, that all of them had issues that would make them difficult or impossible to safely shoot, period, which is part of his defense. But of course it would not be a matter of just taking his word for it. The government was free to argue to the jury that he did not have the intent that he claimed to have. The thing is, it was just the jury's job to adjudicate between those two positions. And by indicating to the jury that his intent didn't matter, the government deprived him of the ability to put on that defense. Okay. So unless your honors have any further questions, I'll reserve my time. Good morning. May it please the court, Zach Howe for the United States. Starting with the search, Detective White reasonably relied on three different sources to confirm Fentzel's probation status. One was the police database, the second was the city attorney who checked court minutes, and the third was the probation officer. The district court concluded that the officer acted in a reasonable manner in doing so, and I think the court should conclude the same. In fact, suppression would be particularly inappropriate here because, as the Supreme Court and this Court have noted, the suppression rule is not meant to deter external sources like the court or the city attorney's office or probation, all of which the officer here relied on. So do we ignore that probation said we're not even fixing the misdemeanor ones yet? Probation did not say that. What they said is that they were not directly responsible for misdemeanor probation and that they weren't aware of the particulars of what the city attorney's office or others responsible for misdemeanor probation were doing. But what probation did say is, and this is at page 190 and 191 of the record, is that they engaged all of the stakeholders who are responsible for misdemeanor probation. So about six months in advance, and this is at page 201, it says about six months in advance of the law going into effect, they engaged all these stakeholders. The court, the city attorney's office, and the public defender's office. So while they didn't know the particulars of what those entities did with regard to misdemeanors, it was eminently reasonable to conclude that when all of those stakeholders are in the mix, that they are going to be updating court records. And that's why the district court made a factual finding that the error here was isolated and unique and unlikely to repeat itself. That's at page 25 and 26. So, counsel, when Officer White spoke to the probation officer, at that time, did the probation officer believe that he was providing accurate information that had already been updated pursuant to AB 1950? I don't know if he says particularly because they didn't talk to the specific probation officer that Detective White talked to. They talked to the supervisory, or rather in court, the testimony was from the supervisory probation officer who was responsible for sort of orchestrating the response to AB 1950. But what he did say at page 195 is that they encouraged officers to call probation even for misdemeanor probation. And that was the direction that was given to the officers as well by their police chief. So they followed those orders from probation and from their own supervisors to call probation. And there was no reason, I think, to rule for my friend on the other side, you would have to say that the only reasonable thing for Detective White to conclude is that the city attorney's office, probation, the courts, the public defender's office would all systematically fall down on the job by not routinely updating court records. But Herring says, in Herring, it says, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances, recurring or systemic negligence. Why is this not the latter? The reason is because you don't have, well, I'll put a caveat on this in a minute, but in the district court, you didn't have a single other example given of any other time when this error had ever occurred. And the court notes that at page 25 of the record, and I'll just quote it. It says, defendant has failed to cite even one other instance in which El Cajon police or any other police department in California conducted a search pursuant to a misdemeanor's fourth amendment waiver that had expired. And in Arizona v. Evans from the Supreme Court, they said even if you can show three or four examples over the course of a couple of years, that alone wouldn't be enough to show systemic negligence. And that was reaffirmed in the Herring case that you cite. So here, the fact that you have not even a single other example would show that there's not systemic negligence. Now, the reason I said I'd put a caveat on that is because for the first time in their reply brief at page six in this court, they do cite three other examples of where this has happened over the course of, I guess, five years. But again, Arizona v. Evans says three or four examples is not enough. And obviously, the reply brief in this court would be a little too late to raise new factual allegations anyway. Now, what I can say is that if you want to look at the legal reasoning of those three California Court of Appeals court cases for their persuasive value, I would encourage you to do so because all three of them found that the good faith exception applied on facts much like these. The only difference was that in those cases, the officers checked fewer sources. In one case, it was one source that they checked. In the other two, it was two sources that they checked. Here, we have three. So I think for all those reasons, you can conclude that Detective White did not act deliberately, recklessly, or grossly negligently, and that there was no systemic error that would cause the court to decline to apply good faith either. So I'm happy to move to the closing argument. Now, I'll say at the outset that I think this is an exceedingly easy case once you get to harmless error, but I feel quite strongly about the merits argument as well. So let me say that the common sense use of the word intended to, when it's being used as an adjective to describe an object or a place, as opposed to an adverb to describe a person's actions, means that that is an objective inquiry into what that object is meant to do. So just to give an example, if I were to say that a court is a place intended for arguments, the fact that I might walk in with my yoga mat intending to do yoga in a yoga studio, it might mean that I'm misusing the yoga studio and that I have the subjective intent to misuse the courtroom, rather. But it wouldn't mean that the courtroom fails to be a courtroom. And you can come up with as many examples as you want where you use intended to to describe an object. We give some about a basketball in our brief, but pick your object. If you describe it with the adjective intended to, the sort of everyday interpretation would be that that's what the object was meant to be used for objectively, not what it was subjectively meant to be used for by the user. My friend on the other side is essentially advancing a sort of Schrodinger's cat theory of statutory interpretation where a weapon both is and is not a rifle and you can never know for sure until you break into the mind of the user and figure out how they intended to use it. And frankly, it's even worse than that because the weapon can be a rifle one minute when they intend to fire it from the shoulder, but then if they decide, you know what, I really didn't like that, I'm not going to do that again, then suddenly the weapon transforms into a non-rifle. And then if they hand it to a friend who does intend to fire it from the shoulder and they give it away, well, then suddenly it becomes a rifle again, and so it can change from person to person, user to user, time to time. That doesn't make a lot of sense. Now, my friend on the other side, I believe, sort of concedes that the common sense meaning doesn't support them. In fact, if you look at the beginning of their reply brief, they say that precedent, quote, trumps the government's appeal to common sense. But I think the text of the statute, for the reasons just discussed, codifies that common sense interpretation. I don't think you have to check your common sense at the door to interpret this statute. Does it make a difference that he made the weapon from a kit? So he didn't buy it off the shelf that way. It came and he had to build it himself. I think it's possible that at some point you simply say that the user is the manufacturer. I don't know if we've crossed that threshold here, given that essentially what happened is you had the barrel and you had the receiver and he drilled some holes and put it together. I don't know if that's enough to call him the designer or the manufacturer or something like that, but I certainly agree that at some point you probably will cross that threshold. And this will ultimately, I'll get to my harmless error argument in a moment, but I do think that even if you were to say that he were the manufacturer in this case, the fact that the government spent all but one sentence of their closing arguing about his intent would, I think, cover that scenario. So I'll get there in a moment, but I just want to put just a bit of meat on the bones of some of the other statutory construction factors, because it's not just that you can rule for us based on common sense. You can look to the technical canons of construction and reach the very same conclusion. I'll just point you to two. One is the associated words canon. And that means that when you have these other words right by intended to, so it's designed or redesigned, made or remade, and intended to, and the parties agree that those other four words are all objective words, then it would be pretty strange to assume that Congress, when it reached the intended to part of the statute, meant to silently insert a mens rea requirement that was a sort of trap for the unwary prosecutor to have to prove. It would be different, perhaps, if the words were desired and intended to or something that you could perhaps interpret as being subjective user-based words that were surrounding that intended to, but that's not what you have here. You have objective words right next to intended to. I think the canon of consistent usage would support concluding that it's objective. And then the final one I'll point you to is the consistent usage canon. And in particular, if you look just a few subsections after the rifle definition, which is at 5845C, if you look at 5845F, there you have Congress saying, and this is the destructive device provision, it said a destructive device would not include, quote, a rifle which the owner intends to use for a sporting purpose. So when Congress wanted to focus on owner intent, on the owner's intent to use a weapon in a certain way, it said that explicitly, just two subsections later. So if you want to give the words independent meaning, then you should conclude that when Congress instead says an object is intended to be used in a certain way, it's not talking about subjective intent. Now my friend on the other side cites the Fredman case, which was interpreting a definition of parts that can be defined as a destructive device. The two differences there that distinguish that case from this one is, number one, that case is framing the intended to as a contrast. So it says that parts can be a destructive device if they are, quote, designed or intended for a purpose, suggesting a contrast, whereas here we're using the conjunctive to suggest a comparison. But the more common sense reason to distinguish those cases is because parts can in of themselves be innocent. So you can have a gas can, you can have a firework, something like that. That's not necessarily a destructive device. It can be if the user intends to use it for a nefarious purpose. Whereas a firearm is complete. We're talking about a completed rifle that doesn't have, I mean, it can have innocent purposes if you register it and go through the right process, but once you're within the realms of the statute, it doesn't have an innocent purpose. So you don't need the subjective intent to separate out innocent conduct. And I think that's why Freedman doesn't ultimately answer the question this Court is addressing. Now, I said this case is a very easy one on harmless error. The reason is because the government spent all but one sentence of its closing argument arguing that Fensel did, in fact, intend to fire this thing from the shoulder. It said that, and this is at page 828, it said that a rifle wouldn't become a paperweight if Fensel intended to use it as one. That's the one time it really mentions the sort of objective purpose of the rifle. But immediately after, it says you don't even have to go to that because you can go back again to what we talked about earlier. And then the government emphasized that Fensel thinks he's in a loophole. He thinks he can just call this a pistol. He wants the jury to believe he doesn't know what he's doing. And then it says, but the evidence shows that he's lying. So the thrust of the government's argument throughout was that Fensel was lying when he said he didn't intend to fire these things from the shoulder. And his excuse for why he put the shoulder stocks on and made this what would seemingly be a rifle was transparently flimsy. He said he put the stock on the rifle simply so that he could stand the gun up in his gun safe. But, of course, then the prosecutor in trial, and Fensel was sitting right about there, took the stock off, went and leaned it up against the courtroom right in front of Fensel and said, you couldn't just do that? And he said, well, I guess I could have. And then he ultimately said, well, I wouldn't stand it on the barrel. So the prosecutor flipped it upside down, and again it stood up. So his whole excuse for putting the shoulder stock on the gun was transparently illusory because he didn't need the shoulder stock to stand the gun up in his gun safe. And he also agreed that he hadn't put the shoulder stock on other items that he had leaned in his safe or his cabinet, like swords or barrels or things like that. He only happened to choose the weapon that could be fired from the shoulder if he put the shoulder stock on, and he put that shoulder stock on. And then, of course, you have the fact that the testimony showed that these guns had the length of pull for shoulder fire. They had the shoulder stocks. They had the buffer tubes to accept the shoulder stocks as opposed to the buffer tubes not made to accept the shoulder stocks. One of them had rifle sights, which is the two sights versus the one. So it didn't make a lot of sense to say he didn't intend to fire these from the shoulder when they had all of the features that would allow them to fire from the shoulder. You're talking about the charged weapons? That's correct. Only the charged weapons? Only the charged weapons, the three charged firearms. And I should just say a few words about the silencers since I haven't mentioned them much. But the government spent its entire closing arguing that Fentzel intended to use these as silencers. And, again, the evidence overwhelmingly showed that. Fentzel said that these might be solvent traps for cleaning guns, and then at trial for the first time he also floated the idea that they might be car parts. The big problem with that theory is that they had holes all the way through, so they wouldn't trap anything. So it didn't make a lot of sense to call these solvent traps. And then there was the fact that he just said, well, I didn't know these had holes in them. But he said these were his items, that no one else used his drill press, no one else knew where things were in his house, no one else used his things. So it didn't make sense to conclude that anyone else drilled these holes other than him. So I think on both the merits and if you were to conclude that you had to show subjective intent, then on harmlessness, this Court should affirm. I see I've either got about 30 seconds left or I've gone about 30 seconds over. You've got 30 seconds left. Thank you, Your Honor.  Your Honors, I would like to start with the good faith issue again. So I just want to be very clear. The District Court did not find that these records were being updated. It was the government's burden to prove good faith, and there was neither any finding nor any evidence that that was the case. Instead, the judge concluded that these errors were isolated because the judge believed that you had to show multiple examples of police officers making the same error in order to meet the systemic exceptions to Haring. That is not true. So, for example, in Song Jia Cha, a single constitutional violation was deemed to be an example of systemic error because it was the result of a police force systemically not training their officers to do proper searches, and that systemic flaw ended up trickling out throughout the entire investigation, everyone involved in it, and resulting in the constitutional violation. That's what happened here. Likewise, when Haring and Evans talk about systemic error, they're talking about systemic errors in databases, not many officers making the same mistake over and over again. And these databases were systemically flawed and uncorrected. And I see I'm out of time, so unless your honors have other questions. Thank you. Thank you, counsel. U.S. v. Fensel will be submitted, and we'll take up U.S. v. Doyle.
judges: WARDLAW, ALBA, Brown